```
UNITED STATES DISTRICT COURT
OF NEW JERSEY
------------------------------------------------------------------------X
NADIA AXAKOWSKY,                                    CIVIL ACTION NO.
                            Plaintiff,

        -against-                                   **COMPLAINT**


NFL PRODUCTIONS, LLC d/b/a NFL FILMS                Plaintiff Demands A
NFL PRODUCTIONS, INC., GLENN ADAMO,                 Trial by Jury
*Individually*, and KEVIN MCLOUGHLIN, *Individually*

                            Defendants.
------------------------------------------------------------------------X
```

Plaintiff, NADIA AXAKOWSKY, as and for her Complaint against the above Defendants respectfully alleges upon information and belief as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII")), and the New Jersey Law Against Discrimination ("NJLAD"), and seeks damages to redress the injuries Plaintiff has suffered as a result of being discriminated against, sexually harassed, retaliated against by her employer solely due to her sex and for complaining of the ongoing harassment.

## JURISDICTION AND VENUE

2. This Court has jurisdiction Pursuant to 42 U.S.C. §12101 *et*. *Seq*.; 29 U.S.C. §2617; 28 U.S.C. §1331, §1343 and supplemental jurisdiction thereto.

3. This actions involves a question of Federal Law under Title VII of the Civil Rights Act of 1964.

4. Venue is proper in this district based upon the fact that Plaintiff was employed by Defendants within the County of Burlington, State of New Jersey. Additionally, the events took place in County of Burlington, New Jersey.

5. On or about February 27, 2017 Plaintiff filed charges with the EEOC against Defendants as set forth herein.

6. On or about May 11, 2017, the EEOC issued Plaintiff a Right to Sue Letter.

7. This action is being commenced within ninety (90) days of receipt of the EEOC Right to Sue Letter.

**PARTIES**

5. Plaintiff, NADIA AXAKOWSKY (hereinafter also referred to as Plaintiff and "AXAKOWSKY") is a resident of the State of Vermont.

6. At all times material, Defendant NFL PRODUCTIONS LLC was and still is a foreign limited liability company organized and existing by virtue of the laws of the State of Delaware.

7. At all times material, Defendant NFL PRODUCTIONS LLC did and continues to do business as "NFL FILMS."

8. That at all times herein mentioned, Defendant NFL PRODUCTIONS, INC. was and still is a foreign business corporation organized and existing by virtue of the laws of the State of Delaware.

9. At all times material Defendant NFL PRODUCTIONS LLC d/b/a NFL FILMS and Defendant NFL PRODUCTIONS, INC. (hereinafter collectively referred to as Defendant or the "NFL") were Plaintiff's joint and solo employer.

10. At all times herein mentioned, Defendant NFL operated and continues to conduct business at 1 NFL Plaza (One Sabol Way), Mt. Laurel, New Jersey 08054, Burlington County.

11. That at all times material, the Plaintiff AXAKOWSKY was an employee of Defendants at the above location.

12. That at all times material, Defendant Kevin McLoughlin (hereinafter "McLoughlin") was employed by Defendant NFL as the Director of Post-Production.

13. At all times material, Defendant McLoughlin had supervisory authority over the Plaintiff.

14. That at all times material, Defendant Glenn Adamo (hereinafter "Adamo") was employed by Defendant NFL as the Vice President of Broadcasting.

15. At all times material, Defendant Adamo had supervisory authority over the Plaintiff.

## MATERIAL FACTS

16. In or around 1997, Plaintiff began working for Defendants as a voice-over artist for company programming.

17. Throughout the course of her employment, Defendants' Producers provided Plaintiff with the specialty knowledge and skill set required of her position by giving her detailed direction as to how they needed her to speak. Defendants' provided Plaintiff with a set script from which she was to record her voice-overs. At no time did Plaintiff have the authority to unilaterally make adjustments or edits to said scripts.

18. Defendants' provided Plaintiff with the means by which to record their scripts, including the microphones, headphones, stands, and studio.

19. At all times material, Defendants' provided Plaintiff with specific times during which she was required to work.

20. At all times material, Plaintiff's employment was based on the sole satisfaction of Defendants' producers.

21. Throughout the final year and a half of her employment, Plaintiff received a guaranteed salary, which, as a result, provided her with certainty of payment on a weekly basis, regardless of whether or not she was able to record voice-overs on a given week.

22. Throughout the course of her employment with Defendants, Plaintiff was subjected to numerous acts of sexual harassment, sex discrimination, retaliation and forced to endure a hostile work environment.

23. At the outset of her employment, Defendants assigned Plaintiff to perform voice-over work for the show "NFL Blast." At the time, Plaintiff was supervised by the show's producer/director, Sam Pena, and Defendant McLoughlin.

24. Within the very first weeks of beginning her employment with Defendants, Mr. Pena subjected Plaintiff to regular unwelcome sexual conduct and comments. Specifically, Mr. Pena would ask Plaintiff out of dates and, when she refused, made statements that she would lose her job if she did not eventually accept

25. By means of example and not meant to be an exhaustive list, Mr. Pena told Plaintiff "you don't know which side of the bread you need to butter," while yanking her over towards him in her rolling chair. Plaintiff pulled herself away and, PENA told Plaintiff "maybe the league will lose the broad this week." At all times material, Mr. Pena made the unwelcome comments and sexually harassed Plaintiff in the presence of the Studio Engineer.

26. At all times material, Defendant McLoughlin was fully aware of Mr. Pena's unlawful conduct and comments. Plaintiff complained to Defendant McLoughlin of the ongoing

harassment, seeking his advise on how to proceed. McLoughlin paid no interests in Plaintiff's complaint.

27. Defendants never properly investigated Plaintiff's complaints and never took appropriate corrective action.

28. At all times material, Defendants allowed the sexually harassing and discriminatory practices to continue in the work environment.

29. In or around 1998, Mr. Pena left his employment with Defendant NFL.

30. In or around 2003, Defendant McLoughlin and Defendant Adamo asked Plaintiff to provide voice-over work as the weekly "Billboard Girl" for the NFL.

31. Shortly following Plaintiff's transfer, Defendant Adamo began to subject Plaintiff to regular unwelcome sexual conduct and comments.

32. By means of example only, and not meant to be an exhaustive list, Defendant Adamo would regularly tell Plaintiff how "pretty" she was, and how he wanted to "smother her with millions of kisses." Similarly to Mr. Pena, Defendant Adamo would relentlessly ask Defendant out.

33. At all times material, Plaintiff would respectfully refuse Defendant Adamo's advances.

34. On or around October 13, 2006, Plaintiff gave birth to a child. At or around this time, Plaintiff began to experience symptoms associated with postpartum depression.

35. In or around the end of October 2006, while suffering the effects of the above depression and while recovering from having given birth via caesarian section, Defendant Adamo showed up at Plaintiff's home to "pay a visit."

36. Upon entering her home, Defendant Adamo proceed to attack Plaintiff. He shoved her down on the couch, kissed her, and forcibly fondled and sexually groped Plaintiff. Aware that Plaintiff

was upset and in an emotional state, Defendant Adamo attempted to calm Plaintiff, stating "it's going to be okay."

37. In or around November 2, 2016, upon returning to work, Defendants Adamo escalated his practice of sexually harassing Plaintiff, constantly demanding to know, "When are we going to get together?"

38. Defendant Adamo would frequently call Plaintiff into his office under the pretense of discussing work. Once behind closed doors, Defendant Adamo would quickly change the topic, grab Plaintiff and attempt to kiss Plaintiff. Defendant Adamo would ask, "When can I take you away?" At all times material, Plaintiff would kindly try to remove herself from Defendants Adamo's grasp and politely change the topic back to work.

39. In retaliation for Plaintiff's rejection, Defendant Adamo would "remind" Plaintiff that he was the "sole reason [she] has a job."

40. Again, Plaintiff complained to Defendant McLoughlin of the ongoing harassment by Defendant Adamo. At all times material, Defendant McLoughlin was aware of the ongoing sexual harassment. Furthermore, Plaintiff complained to the then studio engineer, Terry Madder, stating that Plaintiff was reluctant to meet with Defendant Adamo.

41. Even still, Defendants never properly investigated Plaintiff's complaints and never took appropriate corrective action.

42. At all times material, Defendants allowed the sexually harassing and discriminatory practices to continue in the work environment. More over, upon information and belief, it was common knowledge by Defendant NFL and Defendants' employees that Mr. Adamo was a serial harasser of women, and would often corner women in his office behind closed doors.

43. In or around August 2012, Plaintiff asked for and Defendant NFL approved a raise of $100 per week. Upon receiving notice of the approval, Defendant Adamo demanded Plaintiff immediately come to his office and "thank [him] personally." Unaware of his intentions, Plaintiff proceeded to enter Defendant Adamo's office. Once behind closed doors, Defendant Adamo insisted Plaintiff give him a hug, at which point he grabbed Plaintiff's buttocks, groped and kissed her.

44. As Plaintiff attempted to leave the office, Defendant Adamo told Plaintiff that he was the "sole reason" she had a long-standing career with Defendants.

45. At all times material, Defendant Adamo threatened to retaliate against Plaintiff and sabotage her career with Defendant NFL if she refused his sexual advances and complained about the sexual harassment.

46. In or around 2012, Defendant Adamo referred Plaintiff to a friend of his at MNI Studio's in New York City. Defendant Adamo was aware Plaintiff was interested in singing and arranged for Plaintiff to record her songs. Following her recording session, Defendant Adamo again demanded that Plaintiff come to his office to personally thank him for arranging the recording session. Once in the office, Defendant Adamo shut the door and asked Plaintiff if they could spend the night together, preferably at her home because he did not want anyone to see him. Defendant Adamo stated, "Aren't you going to give me a hug to thank me" and told Plaintiff he wanted to "smother [her] with millions of kisses." When Plaintiff politely rebuffed the unwelcomed advance, Defendant Adamo grabbed Plaintiff by the head and forcibly kissed her.

47. At all times material, Defendant Adamo continued his harassment. Defendant Adamo continued to ask Plaintiff to "get together" outside of work, specifically asking to come to

Plaintiff's home. Defendant Adamo would frequently ask Plaintiff to go on vacations with him and tell Plaintiff he wanted to have sex with her.

48. In or around the July 2015, Plaintiff approached Defendant Adamo regarding her schedule for voice-over work becoming erratic. Plaintiff explained that holding every Friday for Defendants, only to have them cancel her recording time last minute was creating a financial hardship for her. Defendant Adamo promised and represented to Plaintiff that he would ensure that Defendant NFL would pay Plaintiff on a weekly basis, regardless of whether there was scheduled voice-over work for her to perform for that week.

49. Shortly thereafter, upon receiving notice of the approved guaranteed salary, Defendant Adamo again demanded that Plaintiff immediately thank him personally. Once in his office, Defendant Adamo requested she give him a hug. Defendant Adamo proceeded to forcefully grab Plaintiff's buttocks and push his penis into her. In explicit detail, Defendant Adamo proceeded to tell Plaintiff that he wanted to have sex with Plaintiff on his desk and proceeded to shove his hand under Plaintiff's shirt and grab her breasts.

50. Plaintiff pushed Defendant Adamo away, demanding that he stop and screamed, "Glenn, stop" and "You're married!" Plaintiff informed Defendant Adamo that she was very uncomfortable and proceeded to leave the room.

51. As Plaintiff walked away, Defendant Adamo stated, "Nadia, I don't know how long I can keep you." Defendant Adamo further inquired as to when he could visit Plaintiff at her home. Plaintiff was terrified following the attack and feared for her safety.

52. This incident began a continuous pattern in which Defendant Adamo would make an excuse to call Plaintiff into his office and proceed to grope/attempt to grope Plaintiff. At all

times material, Plaintiff was repulsed by Defendant Adamo's behavior and was fearful of these encounters.

53. In or around April 2016, Plaintiff began to consider moving to Vermont so that her child could attend a school geared towards helping students with special needs. Plaintiff spoke openly with Defendant Adamo about this decision. Defendant Adamo assured Plaintiff that she could remain employed by Defendant NFL and even complete her voiceover work remotely if necessary. Defendant Adamo requested a "goodbye hug" and proceeded to grab Plaintiff, reaching up her skirt and grabbing Plaintiff's buttocks and pushing his penis against Plaintiff's body. As Plaintiff pulled away, Defendant Adamo state he had concerns as to whether he would be able to keep Plaintiff as the Billboard Girl, and told Plaintiff to "Think about it."

54. In or around June 2016, Defendant Adamo unexpectedly left his employment with Defendant NFL.

55. In or around July 2016, in reliance of Defendant Adamo's representations and promises, Plaintiff moved to Vermont to relocate her special needs child to his new private school, incurring moving expenses, new home expenses, and studio rental fees for performing voice-over work remotely.

56. On or around July 15 2016, Defendant McLoughlin called Plaintiff in regards to the voice-over work she had just performed and submitted from Vermont. Also presently on the call, initially unbeknownst to Plaintiff, was Defendants' Vice President and Executive in charge of production Operations, Jeremy Swarbrick.

57. Mr. Swarbrick and Defendant McLoughlin informedPlaintiff that, despite Defendant Adamo's express promises, Defendant NFL would no longer pay Plaintiff her weekly salary.

58. At Plaintiff's next booking, Defendant McLoughlin directed Plaintiff to perform and complete voice-over work for different programming than the NFL Billboards, for no additional compensation.

59. On or around September 1, 2016, Plaintiff appeared for a booking at Defendant Mt. Laurel location. Following the session, Plaintiff asked Defendant McLoughlin about the removal of her guarantees salary. Defendant McLoughlin responded that the decision was "above [her] pay grade" and that "Glenn is gone." Plaintiff became emotional and started to cry, stating "You know I've put up with him sexually harassing me for years." Plaintiff specifically referenced Defendant Adamo's requests for "millions of kisses." Plaintiff ended the conversation stating she would have never moved if Defendant Adamo had not guaranteed her job, offering to return on Fridays to New Jersey if it was helpful.

60. On or around September 28, 2016, Defendants' wrongfully and unlawfully terminated Plaintiff in retaliation for her continued refusal to respond to the ongoing and unwelcome sexual advances made by Defendant Adamo.

61. That as a result of That as a result of Defendants' conduct and comments, Plaintiff was caused to sustain serious and permanent personal injuries, including permanent psychological injuries.

62. Plaintiff suffers from regular panic attacks and nightmares relating to Respondents' conduct.

63. As a result of Defendant's actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

64. As a result of Defendants' discriminatory and intolerable treatment of Plaintiff, she suffered and continues to suffer severe emotional distress.

65. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

66. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against Defendant.

67. As Respondents' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages.

68. The above are just some examples, of some of the discrimination and retaliation to which Respondents subjected Plaintiff.

69. The Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

**AS A FIRST CAUSE OF ACTION
FOR DISCRIMINATION UNDER TITLE VII
(Not Against Individual Defendants)**

70. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

71. Title VII states in relevant parts as follows: § 2000e-2. *[Section 703]*(a) Employer practices It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

72. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against Plaintiff because of her gender and sex.

**AS A SECOND CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER TITLE VII**
**(Not Against Individual Defendants)**

73. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this complaint.

74. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> "(1) to … discriminate against any of their employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

75. Defendants engaged in unlawful employment practice prohibited by 42 U.S.C. $2000e *et seq*. by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because he opposed Defendants' unlawful employment practices.

**AS A THIRD CAUSE OF ACTION**
**UNDER NEW JERSEY STATE LAW**
**DISCRIMINATION**

76. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

77. New Jersey's Law against Discrimination Section 10:5-12(a) sets forth in pertinent part as follows: " It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: a) For an employer, because of race . . , color, national origin . . , sex.. to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations

other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

78. The full statute reads as follows: **10:5-12. Unlawful employment practices, discrimination.**

It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:

a.    For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, or because of the refusal to submit to a genetic test or make available the results of a genetic test to an employer, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment; provided, however, it shall not be an unlawful employment practice to refuse to accept for employment an applicant who has received a notice of induction or orders to report for active duty in the armed forces; provided further that nothing herein contained shall be construed to bar an employer from refusing to accept for employment any person on the basis of sex in those certain circumstances where sex is a bona fide occupational qualification, reasonably necessary to the normal operation of the particular business or enterprise; provided further that nothing herein contained shall be construed to bar an employer from refusing to accept for employment or to promote any person over 70 years of age; provided further that it shall not be an unlawful employment practice for a club exclusively social or fraternal to use club membership as a uniform qualification for employment, or for a religious association or organization to utilize religious affiliation as a uniform qualification in the employment of clergy, religious teachers or

other employees engaged in the religious activities of the association or organization, or in following the tenets of its religion in establishing and utilizing criteria for employment of an employee; provided further, that it shall not be an unlawful employment practice to require the retirement of any employee who, for the two-year period immediately before retirement, is employed in a bona fide executive or a high policy-making position, if that employee is entitled to an immediate non-forfeitable annual retirement benefit from a pension, profit sharing, savings or deferred retirement plan, or any combination of those plans, of the employer of that employee which equals in the aggregate at least $27,000.00; and provided further that an employer may restrict employment to citizens of the United States where such restriction is required by federal law or is otherwise necessary to protect the national interest.

79. New Jersey's Law against Discrimination Section 10:5-12(l) sets forth in pertinent part as follows: [i]t shall be . . . an unlawful discrimination . . . [f]or any person to refuse to buy from, sell to, lease from or to, license, contract with, or trade with, provide goods, services or information to, or otherwise do business with any other person on the basis of the . . . sex . . . of such other person . . ."

80. Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff as set forth herein.

81. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of the New Jersey's Law against Discrimination.

### AS A FOURTH CAUSE OF ACTION
### UNDER NEW JERSEY STATE LAW
### RETALIATION

82. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

83. New Jersey's Law against Discrimination Section 10:5-12(d) sets forth that it is unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.

84. Defendants violated this section as set forth herein.

### AS A FIFTH CAUSE OF ACTION
### UNDER NEW JERSEY STATE LAW
### AIDING AND ABETTING

85. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

86. New Jersey's Law against Discrimination Section 10:5-12(e) sets forth in pertinent part as follows: "Unlawful employment practices, discrimination. It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: e) For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so."

87. Defendants engaged in an unlawful discriminatory practice by aiding and abetting the discrimination against the Plaintiff as set forth herein.

88. Defendants violated all other applicable sections of N.J. Stat. § 10:5-12(e) et. Seq.

89. As such, Plaintiff has been damaged as set forth herein.

### AS A SIXTH CAUSE OF ACTION FOR
### ASSAULT AND BATTERY
### (As Against Defendant Adamo)

90. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

91. That Defendant assaulted and battered Plaintiff herein and did cause unwelcomed contact.

92. That Plaintiff did not consent to the contact and that the above contact was offensive.

93. Plaintiff was damaged thereby.

## AS A SEVENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

94. Plaintiff, individually and on behalf of all persons similarly situated, repeats and realleges each and every allegation made in the above paragraphs of this complaint.

95. To prove a claim for Intentional Infliction of Emotional Distress, a plaintiff must show (1). the defendant acted recklessly or intentionally; (2). the conduct was extreme and outrageous; (3). the defendant's action was the proximate cause of the plaintiff's distress; and (4). the plaintiff actually suffered severe emotional distress. Buckley v. Trenton Saving Fund Society, 111 N.J. 355 (1988) (citing Restatement, Second, of Torts, §46 (1965)).

96. Where Defendants actions toward Plaintiff were extreme and outrageous, and caused Plaintiff to suffer severe emotional distress, Plaintiff makes a claim under New Jersey common law.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including, but not limited to, all emotional distress, back pay and front pay, punitive damages, liquidated damages, statutory

damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated: June 27, 2017                   DEREK SMITH LAW GROUP, PLLC
        Philadelphia, Pennsylvania         *Attorneys for Plaintiffs*

                                          By: _____
                                                Caroline H. Miller, Esquire
                                                1845 Walnut Street, Suite 1600
                                                Philadelphia, Pennsylvania 19103
                                                (215) 391-4790

# CIVIL COVER SHEET

JS 44 (Rev. 12/12)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
NADIA AXAKOWSKY

## DEFENDANTS
NFL PRODUCTIONS, LLC d/b/a NFL FILMS, NFL PRODUCTIONS INC., GLENN ADAMO, and KEVIN MCLOUGHLIN

**(b)** County of Residence of First Listed Plaintiff: Caledonia County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: Burlington County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Derek Smith Law Group, PLLC
1845 Walnut Street, Suite 1600
Philadelphia, Pennsylvania 19103

Attorneys *(If Known)*
UNKNOWN

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*
- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Checked: **550 Civil Rights**

## V. ORIGIN *(Place an "X" in One Box Only)*
- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII")) and to remedy violations of the New Jersey Law Against Discrimination ("NJLAD")

Brief description of cause:
Plaintiff is seeking damages to redress the injuries Plaintiff has suffered as a result of being discriminated against, sexually harassed, retaliated against by her employer solely due to her sex and for complaining of the ongoing harassment

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*: JUDGE _____ DOCKET NUMBER _____

DATE: 06/27/2017

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

JS 44 Reverse  (Rev. 12/12)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below**; **NOTE: federal question actions take precedence over diversity cases.**)

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V. Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.