IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| NADIA AXAKOWSKY<br><br>    Plaintiff,<br><br>        v.<br><br>NFL PRODUCTIONS, LLC d/b/a NFL FILMS, et al.,<br><br>    Defendants. | Civil No. 17-4730<br><br>**OPINION** |

APPERANCES:

DEREK T. SMITH LAW GROUP, P.C.
By: Caroline H. Miller, Esq.
1845 Walnut Street, Suite 1601
Philadelphia, Pennsylvania 19103
        Counsel for Plaintiff

PROSKAUER ROSE LLP
By: Michelle A. Annese, Esq.
    Elise M. Bloom, Esq.
One Newark Center, 18th Floor
Newark, New Jersey 07102
        Counsel for Defendants

**BUMB, UNITED STATES DISTRICT JUDGE:**

This matter comes before the Court upon Defendants' Motion for Partial Summary Judgment. In this Title VII hostile work environment suit, the issues raised by the motion are: (1) whether Plaintiff was an employee of Defendants or an independent contractor, and (2) if Plaintiff was an independent contractor, has she nevertheless stated a claim under the New Jersey Law Against Discrimination, N.J.S.A. §

1

10:5-12(*l*).  For the reasons set forth herein, the Court holds that a reasonable factfinder could only conclude that Plaintiff was an independent contractor, and that Plaintiff's NJLAD claim fails as a matter of law.  Accordingly, Defendants' motion will be granted.[1]

## I. Facts

Plaintiff Nadia Axakowsky is an "actress, singer, voiceover talent, and TV Host."  (Statement of Undisputed Facts ¶¶ 111-113, 7-12)[2]  She maintains her own website, "nadiatalk.com."  (Id. ¶ 110)  Parties who wish to "book" her services do so through her agent. (Id. ¶¶ 114-16)

Axakowsky first began working for Defendant NFL Productions "after she submitted a cassette tape with a sample of her talent and auditioned."  (Statement of Undisputed Facts ¶ 14)  "Plaintiff was selected because . . . she had the right talent for the project." (Id. ¶ 16)

From 2003 through September 2016, Axakowsky regularly provided voice services to NFL Productions by "reading billboards," which are 10 to 15 second scripted advertisements.  (Statement of Undisputed Facts ¶ 19-20)  "<u>If</u> there were billboards to be read, they would be read" during a once-weekly recording session which lasted, "at most,

---

[1]  The Court has both federal question, 28 U.S.C. § 1331, and diversity of citizenship, 28 U.S.C. § 1332, subject matter jurisdiction over this suit.

[2]  Axakowsky's acting credits include appearances on "The West Wing," "Cold Case Files," "Hack" and "Minority Report." (Axakowsky Dep. p. 22)

2

1.5 hours, depending on the number of billboards." (Id. ¶¶ 22-23) (emphasis added) The advertisers, not NFL Productions, determined whether there were billboards to be read on any given week. (Id. ¶ 24) "If there were no billboards, Plaintiff's services would not be needed and she would be informed as such" by NFL Productions. (Id. ¶ 30)

"NFL Productions, in advance of each recording session, provided Plaintiff with a copy of the script for each of the billboards that she would read during the session," however, "[t]he advertiser was the final and ultimate approver of the billboard." (Statement of Undisputed Facts ¶¶ 32-33) Depending on the advertiser, Axakowsky might be asked to read a billboard in "a soccer mom voice" (Axakowsky Dep. p. 110)[3], or "with high energy" and "a sense of excitement" (Miller Decl. Ex. 12), or with an intonation matching the advertiser's other commercials. (Id. Ex. 13)[4]

Axakowsky recorded almost all of the billboards at NFL Productions' studios in Mount Laurel, New Jersey. (Statement of Undisputed Facts ¶ 39) She used the recording equipment in the studio provided by NFL Productions, not her own equipment. (Id. ¶ 42)

---

[3] McLoughlin testified that an advertiser reviewed a billboard read by Axakowsky and gave feedback to "[k]nock off the sultry. We want soccer mom." (McLoughlin Dep. p. 68)

[4] See also, McLoughlin Dep. p. 30 ("certain products had a way they had to be read, there was a certain enunciation or a [sic] inflection that [Axakowsky] needed to present as per the [advertiser's] notes and script.").

3

"During a recording session, both [Defendant] McLoughlin [who directed the billboards] and an audio engineer were present." (Id. ¶¶ 4-5, 37) "Plaintiff could ask for a billboard to be played back so that she could hear it." (Id. ¶ 35) "If she was not satisfied with how the recording sounded, Plaintiff could ask to rerecord it." (Id. ¶ 36) "McLoughlin informed Plaintiff that she needed to read the billboard within 10 to 15 seconds – the industry standard for billboards – and to reread the billboard if, for example, she misread a script and it failed to match what the client had requested." (Id. ¶ 38)[5] McLoughlin testified that his duties as Director of Postproduction included "quality control,"-- i.e., "[w]hen we finish a program, show, segment, it would need to be looked at before it went out to broadcast to make sure it was technically sound. There were no mistakes, no curses, no errors." (McLoughlin Dep. p. 16)

"Plaintiff was initially paid a fixed fee of $500 for each session." (Statement of Undisputed Facts ¶ 58) "Following each recording session," Axakowsky would get paid by "submit[ing] an invoice to NFL Productions" which NFL Productions would pay. (Id. ¶¶ 54, 55) At some unspecified time, Axakowsky "requested an increase of her rate to $600 per session," which NFL Productions "agreed to pay." (Id. ¶ 63) For the majority of the time Axakowsky provided

---

[5] McLoughlin testified, "[t]he only direction I would give is, I needed it in 10 seconds, or if she left a word out, which sometimes can happen when you're reading, a word gets dropped or you add a word." (McLoughlin Dep. p. 37)

4

voiceover services to NFL Productions, she would only be paid if a recording session occurred, or if the session was cancelled within 24 hours of it being scheduled to occur. (Id. ¶¶ 60-61, 65) However, there was a period of about one year-- from July 2015 to July 2016-- where NFL Productions "guaranteed payment [of $600] for one recording session per week regardless of whether the session occurred." (Id. ¶ 62-63) "During the time that she provided voiceover services to NFL Productions, Plaintiff continued to audition" for other voiceover work. (Id. ¶ 117)

For the tax years 2011 through 2016, NFL Productions issued Axakowsky a Form 1099 rather than a W-2. (Statement of Undisputed Facts ¶¶ 72-73) NFL Productions did not provide Axakowsky with an e-mail address[6], nor telephone number, nor any health, dental or retirement benefits. (Id. ¶¶ 50, 52) For the period 2013 through 2016, Axakowsky received health, dental and retirement benefits through her union, the Screen Actors Guild. (Axakowsky Dep. p. 65-67)

In May, 2016, Defendant Adamo, Vice President of Media & Operations at NFL Productions, wrote the following employment recommendation for Axakowsky:

---

[6] Axakowsky used "nadiatalk@comcast.net" to email NFL Productions employees, who had email addresses ending with "@nfl.com." (Miller Decl. Exs 6, 11, 12, 13)

5

> To whom it may concern;
>
> Nadia Axakowsky has been employed by the NFL since 1996, working as a voice-over talent. I have personally worked with Nadia since 2003, after I selected her to be the voice of NFL Network. She is prompt, dependable, collaborative, and works very hard at her craft. We have used her for other shows as well, including Super Bowl, Combine, Draft and all our major events. She is our "go to" person because she is always ready and able to work and always gives it her professional best.
>
> I wholeheartedly recommend working with Nadia, as she is an honest, pleasant person whom we have come to know and respect. Despite her pending move to Vermont, she will always have a job with NFL Network because, after 12+ years since we launched, her voice is synonymous with the network!
>
> Should you have any other questions, please feel free to call me as I would be happy to speak on her behalf.

(Miller Decl. Ex. 5)[7]

Axakowsky also testified at her deposition that, during a conversation where Axakowsky complained about her agent not finding her additional work, Defendant McLoughlin once told Axakowsky that she could not be the "billboard girl" for the NFL while also working for another sports network. (Axakowsky Dep. p. 87)

## II. <u>Summary Judgment Standard</u>

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might impact the "outcome of the suit under the governing law." <u>Gonzalez v. Sec'y of Dept of Homeland</u>

---

[7] On another occasion, Defendant McLoughlin wrote a recommendation wherein he stated "[Axakowsky] has been employed with NFL Films and NFL Network on a freelance basis since 1996." (Miller Decl. Ex. 6)

6

Sec., 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. Id.

In determining the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable inferences and doubts should be resolved in favor of the nonmoving party. Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 387 (3d Cir. 2010). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). Moreover, a court need not adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 372, 380 (2007). In the face of such evidence, summary judgment is still appropriate "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Walsh v. Krantz, 386 F. App'x 334, 338 (3d Cir. 2010).

The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." Connection Training Servs. v. City of Phila., 358 F. App'x 315, 318 (3d Cir. 2009). "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate." Id. In

7

the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: he "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); accord. Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC. v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment."). However, "the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial"; the evidence does not need to be in admissible form at the time of summary judgment. FOP v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016).

**III. Analysis**

   **A. Title VII claim**

The anti-discrimination provisions of Title VII protect only "employees," not "independent contractors." Hill-Keyes v. Commissioner of the U.S. Social Security Administration, 658 F. App'x 86, 88 (3d Cir. 2016) (citing Faush v. Tuesday Morning, Inc., 808 F.3d 208, 213 (3d Cir. 2015)). To distinguish employees from independent contractors, the Court must consider a non-exhaustive list of factors first set forth by the Supreme Court in Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318 (1992). Id. Those factors are:

8

> the skill required; the source of the instrumentalities
> and tools; the location of the work; the duration of the
> relationship between the parties; whether the hiring
> party has the right to assign additional projects to the
> hired party; the extent of the hired party's discretion
> over when and how long to work; the method of payment;
> the hired party's role in hiring and paying assistants;
> whether the work is part of the regular business of the
> hiring party; whether the hiring party is in business;
> the provision of employee benefits; and the tax
> treatment of the hired party.

Faush, 808 F.3d at 214 (quoting Darden).[8] The Third Circuit has instructed that the analysis should "focus[] on" "factors pertaining to compensation," "to hiring and firing," and the putative employer's "control over the [putative] employee's daily activities." Id. 215-16. However, all evidence relevant to the question of "'the hiring party's right to control the manner and means by which the [work] product is accomplished,'" "'must be assessed and weighed.'" Id. (quoting Darden).

In this case, a reasonable factfinder could only conclude that Axakowsky was an independent contractor, not an employee. The undisputed facts that NFL Productions: (a) issued Axakowsky a 1099 income tax form, rather than a W-2, and (b) provided her no benefits, weigh in favor of independent contractor status. See Hill-Keyes, 658 F. App'x at 89 ("willingness to be a 1099-employee is evidence of the acceptance of independent contractor status"). Similarly, that

---

[8] See also, Covington v. Int'l Ass'n of Approved Basketball Officials, 710 F.3d 114 (3d Cir. 2013) (applying the Darden test); Pavlik v. Int'l Excess Agency, Inc., 417 F. App'x 163 (3d Cir. 2011) (applying the Darden test); Brown v. J. Kaz, Inc., 581 F.3d 175 (3d Cir. 2009) (applying the Darden test).

Axakowsky was not a salaried employee-- she was paid a flat fee independent of the number of billboards she recorded in a given session, and that Axakowski invoiced NFL Productions per session for her services, further weigh in favor of a finding that Axakowsky was an independent contractor. See Faush, 808 F.3d at 216 ("paying . . . a fixed rate for the completion of a discrete project [is] a method by which independent contractors are often compensated.").

It is also undisputed that NFL Productions hired Axakowsky for her "skill" / "talent" as an actress and "voiceover artist." (Statement of Undisputed Facts ¶¶ 10-12)[9] This fact is particularly important because the nature of the putative employee's business must necessarily inform the Court's analysis of many of the other Darden factors. For example, whether a putative employee has the freedom to subcontract or hire assistants may be a more relevant and weighty consideration in other cases, but not so in this case where Axakowsky's work product was her individual performance. Indeed, Defendant McLoughlin testified at his deposition:

    Q.  As a voice-over artist, could [Axakowsky] have hired an additional artist to help her with a script?

    A.  There was no need to.

    Q.  But could she have brought in additional talent?

    A.  Bring in other talent to do what?

---

[9] See generally, Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, 118 (2d Cir. 2000) ("Other courts have held that the level of skill associated with being an architect, computer programmer, graphic artist, photographer, or treasurer suggests that workers who perform these jobs are independent contractors.").

> Q. Could she have assigned her work to someone else?
>
> A. Oh, if she didn't want to do it? No, because she would have to let us know, because we would have to get approval.

(McLoughlin Dep. p. 55)

Similarly, Axakowsky emphasizes that she had very little control over certain aspects of her work insofar as she almost always used NFL Productions' recording studio and equipment, and did so mainly on NFL Productions' schedule. These facts, however, are less weighty in the Court's analysis when considered in light of the nature of the work at issue.

Two cases are analogous in this regard. In <u>Alberty-Vélez v. Corporación de Puerto Rico para la Difsión Publica</u>, the First Circuit affirmed the district court's ruling on summary judgment that a reasonable jury could only conclude that the plaintiff, a television host, was an independent contractor. 361 F.3d 1 (1st Cir. 2004). Addressing the plaintiff/appellant's argument that the <u>Darden</u> "tools and instrumentalities" factor favored a finding of employee, and not independent contractor, the Court explained:

> Alberty's argument is misplaced. The equipment necessary for Alberty to conduct *her job* as host of "Desde Mi Pueblo" related to her appearance on the show. Others provided equipment for filming and producing the show, but these were not the primary tools that Alberty used to perform her particular function. If we accepted this argument, independent contractors could never work on collaborative projects because other individuals often provide the equipment required for different aspects of the collaboration.

11

Alberty-Velez, 361 F.3d at 8 (emphasis in original).

The Eight Circuit ruled similarly in Lehrol v. Friends of Minnesota Sinfonia, 322 F.3d 486 (8th Cir. 2003). In that case, the Court affirmed the district court's ruling on summary judgment that a reasonable jury could only conclude that the plaintiffs, two professional musicians, were independent contractors. The musicians argued that because the symphony conductor controlled rehearsals and concerts, and could even tell musicians where to sit and when to play, the musicians lacked the control necessary to a finding that they were independent contractors. Id. at 490-91. The Eighth Circuit disagreed:

> We emphatically reject that approach. . . . the notion that musicians are always employees when they perform in a conducted band or orchestra flies in the face of both common sense and undisputed facts in this record. . . . Work by independent contractors is often, if not typically, performed to the exacting specifications of the hiring party. . . . Thus, although one relevant factor was [the conductor's] undisputed control in selecting the music to be played, scheduling Sinfonia rehearsals and concerts, and determining the manner in which the concert music was collectively played, that factor is not determinative of the [Darden] issue.

Lerohl v. Friends of Minnesota Sinfonia, 322 F.3d 486, 490 (8th Cir. 2003); see also, Alberty-Velez, 361 F.3d at 9 ("While 'control' over the manner, location, and hours of work is often critical to the independent contractor/employee analysis, it must be considered in light of the work performed and the industry at issue.").[10]

---

[10] Cf. Redd v. Summers, 232 F.3d 933, 938 (D.C. Cir. 2000) ("we note a difference between work involving a performance directed to the

In this Court's view, Axakowsky is like the television host in Alberty-Velez and the musicians in Faush. Where a putative employee's work product is an individual performance, "control" of "the manner and means by which the [work] product is accomplished," Darden, must be viewed in that context. Thus, while the putative employer typically dictates the script to be read, or the music to be played, and typically provides the equipment necessary to produce a particular performance, such facts do not preclude a finding that a putative employee is an independent contractor. Such are often the practical realities of performance-based industries. See Alberty-Velez, 361 F.3d at 9 ("Just as an orchestra musician is subject to the control of the conductor during concerts and rehearsals, an actor is subject to the control of the director during filming. To hold that this sort of control determined Alberty's status would defy 'common sense' as it would result in classifying all actors as employees, regardless of other aspects of the relationship.") (quoting Lerohl).[11]

---

putative employer's customers, and work involving production of a tangible object. In the latter case, obviously, a party can exercise control over the 'result' without ever laying eyes on the worker; here, by contrast, control over the 'result,' the guides' tour presentations, requires some review of the guides as they give their spiels.").

[11] See also, Khaksari v. Chairmain, Broadcasting Bd. of Governors, 689 F. Supp.2d 87, 91-92 (D.D.C. 2010) (holding on summary judgment, that the plaintiff, a Farsi translator, was an independent contractor even though she performed her work "on [the media agency's] premises and used equipment supplied by the [agency]."); Powell-Ross v. All Star Radio, Inc., 1995 WL 491291 at *8 (E.D.Pa. 1995)(holding on

13

Accordingly, the undisputed fact that Defendant McLoughlin could direct Axakowsky to re-record a billboard for simply missing a word, when viewed in a vacuum, may appear to be the requisite control, it is, as McLoughlin testified, merely "quality control" (McLoughlin Dep. p. 16), within the context of this case. See Brown v. J. Kaz, Inc., 581 F.3d 175, 180-81 (3d Cir. 2009) (stating that "controls" that were "the minimum that a corporation needs to maintain the quality of its product and services, and consistency in its business practices" are "not . . . sufficient to transform Brown into an employee."). The more relevant "control" inquiry for this case is whether Axakowsky could decline to do additional billboard session recordings and whether she could provide her voiceover services elsewhere. See Alberty-Velez, 361 F.3d at 9 (following Lerohl, 322 F.3d at 491). The record evidence supports only one answer: she could.

It is undisputed that over the course of the parties' approximately 12-year course of dealing, Axakowsky always invoiced NFL Productions on a per recording session basis, after the session had occurred. (Statement of Undisputed Facts ¶ 54) A reasonable factfinder could only infer from this arrangement that should Axakowsky wish not to participate in a given recording session, she

---

summary judgment, that the plaintiff, an on-air radio disc jockey, was an independent contractor even though the station "could understandably require [plaintiff] to appear at the station during the hours of her show" because "otherwise there would be nothing but dead air.").

would be free to do so; she would simply not participate and not invoice NFL Productions.  This conclusion is further strengthened by the undisputed absence of any written agreement between the parties (Statement of Undisputed Facts ¶ 57)--i.e., Axakowsky could not have any contractual obligation to provide any voiceover services because no contract existed.

The record evidence also suggests that Axakowsky could provide her voiceover services elsewhere.  It is undisputed that "[d]uring the time that she provided voiceover services to NFL Productions, Plaintiff continued to audition" for other voiceover work. (Statement of Undisputed Facts ¶ 117)  Further, McLoughlin testified: "[t]he rule with most narrators that I've dealt with in my time, less than 24 hours, you're on the hook [to pay the narrator].  Anything more than 24 hours, talk to you next week. . . . [I]f it was less than 24-hour notice . . . NFL Network would have to pay [Axakowsky] because it would not give her . . . enough time to find another gig or book herself on another project."  (McLoughlin Dep. p. 53)

The fact that McLoughlin allegedly once told Axakowsky that she could not do voiceover work for another sports network, such as ESPN, does not undermine the Court's conclusion.[12]  There is no evidence in

---

[12] McLoughlin testified that Axakowsky could do voice-over work for other sports organizations. (McLoughlin Dep. p. 41)  The Court also notes that there is no evidence of a written non-compete agreement between Axakowsky and NFL Productions.  For the purposes of this motion, however, the Court resolves this factual dispute in favor of Axakowsky.

the record that Axakowsky was not free to do voiceover work for non-sports programming airing on television, radio, or internet stations. Therefore, even though this is some evidence of control, it is not enough, when weighed together with all of the other Darden factors, to lead a reasonable factfinder to conclude that Axakowsky was an employee rather than an independent contractor.

Nor does Defendant Adamo's reference letter tilt the balance of factors from independent contractor to employee. Adamo's characterization of Axakowsky, in a reference letter, as being "employed by," and having a "job" with, NFL Productions is of limited probative value to the issue before the Court, which is whether Axakowsky was an "employee" under Title VII.

Lastly, the duration of the relationship between Axakowsky and NFL Productions lasted approximately 13 years, which is a lengthy period of time. However, this length of time is somewhat modified by the undisputed fact that Axakowsky only worked a maximum of once a week for all of those years. (Statement of Undisputed Facts ¶ 22) While this factor alones weighs somewhat in favor of a finding that Axakowsky was an employee, it cannot overcome the vast majority of record evidence supporting the conclusion that Axakowsky was an independent contractor. See Hill-Keyes, 658 F. App'x at 89 ("the duration of employment does not in and of itself suggest employee status."); Speen v. Crown Clothing Corp., 102 F.3d 625, 627 (1st Cir. 1997) (affirming district court's conclusion at summary judgment that

plaintiff was an independent contractor despite the parties' twenty-year relationship).

Thus, the Court holds that a reasonable factfinder could only conclude that Axakowsky was an independent contractor. Accordingly, Defendants' Motion for Summary Judgment as to the Title VII claim will be granted.[13]

**B. NJLAD claim**

As to the NJLAD claim, Axakowsky asserts that even if she is an independent contractor, she may still recover under the "creation and termination of contracts" subsection of the LAD. See N.J.S.A. § 10:5-12(*l*) ("It shall be . . . unlawful discrimination . . . [f]or any person to refuse to buy from, sell to, lease from or to, license, contract with, or trade with, provide goods, services or information to, or otherwise do business with any other person on the basis of the . . . sex, gender identity or expression[.]").

However, both parties acknowledge that New Jersey case law limits a cause of action under this section to claims of *quid pro quo* sexual harassment-- i.e., a refusal to contract with, or to continue to do business with, the plaintiff unless plaintiff "submi[t]s to the sexual demands" of a defendant. J.T.'s Tire Serv., Inc. v. United

---

[13] In light of this disposition, the Court does not reach Defendants' alternative argument that, based on Axakowsky's representations in her bankruptcy case, judicial estoppel precludes Axakowsky from asserting that she is an employee. Likewise, the Court need not address Defendants' sham affidavit argument. (See Reply Brief, p. 6-10) Even accepting as true all of the factual statements in Axakowsky's affidavit, the Court's conclusion remains unchanged.

Rentals N. Am., Inc., 411 N.J. Super. 236, 241, 985 A.2d 211, 215 (App. Div. 2010).

While Axakowsky argues that J.T.'s Tire Service should be extended to apply to her hostile work environment claim under the LAD (Opposition Brief, p. 23), as Defendants correctly observe, case law is decidedly against Axakowsky on this point. See 7-Eleven, Inc. v. Sodhi, 2016 WL 3085897, at *7 (D.N.J. May 31, 2016), aff'd sub nom. 7 Eleven Inc v. Sodhi, 706 F. App'x 777 (3d Cir. 2017) ("Because the NJLAD does not cover discrimination during the ongoing execution of a contract, Mr. Sodhi's NJLAD claim fails as a matter of law."); see also McMahon v. Univ. of Med. & Dentistry of New Jersey, 2011 WL 5082246, at *6 (D.N.J. Oct. 26, 2011) ("a claim of mere harassment by the Defendants during Plaintiff's studies at UMDNJ would not violate [§ 10:5-12(*l*)]" because that section "protects individuals from discriminatory refusals to deal-- it does not address hostile work . . . environments.").[14]

This Court agrees with the other courts that have addressed the issue. The statute expressly covers only refusals to do business with a person based on a protected characteristic. Axakowsky does not assert a *quid pro quo* sexual harassment claim; she expressly

---

[14] See generally, Rowan v. Hartford Plaza Ltd., 2013 WL 1350095 at *10 (App. Div. 2013) ("N.J.S.A. 10:5-12(l) does not apply to discrimination during the ongoing execution of a contract. . . . N.J.S.A. 10:5-12(l) prohibits refusal to contract with a person on the basis of a number of protected classifications, including sex.").

18

states in her opposition brief that her claim is based on "ongoing, severe and pervasive harassment."  (Opposition Brief, p. 24)[15] Accordingly, the Court holds that Axakowsky's NJLAD claim fails as a matter of law, and Defendants' Motion for Summary Judgment as to the NJLAD claim will be granted.

## IV. Conclusion

For the forgoing reasons, Defendants' Motion for Partial Summary Judgment will be granted as to the Title VII claim and the NJLAD hostile work environment claim.

November 14, 2018                         s/ Renée Marie Bumb
                                          RENÉE MARIE BUMB
                                          UNITED STATES DISTRICT JUDGE

---

[15] See also, Second Amended Complaint, ¶ 20 ("Throughout the course of her employment with Defendants, Plaintiff was subjected to numerous acts of sexual harassment, sex discrimination, retaliation and forced to endure a hostile work environment.").